[No. B140027. Second Dist.; Div. Five. Oct. 23, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
REUBEN KENNETH LUJAN, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.C.-D.

1390

**COUNSEL**

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Marc J. Nolan and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## TURNER, P. J.—

### I. INTRODUCTION

Defendant, Reuben Kenneth Lujan, appeals from his conviction for two first degree murder counts (Pen. Code,[1] § 187, subd. (a)) and one stalking count. (§ 646.9, subd. (a).) Defendant was also found to have personally used a deadly weapon in the commission of both murders. (§ 12022, subd. (b)(1).) The jury also made true findings regarding the special circumstance allegations of intentional killing while lying in wait and conviction of multiple murders. (§ 190.2, subd. (a)(3), (15).) Defendant was convicted of stalking in the initial trial. A mistrial was declared as to the two murder counts at that trial because the jury was unable to reach a verdict on the homicide charges. The homicide convictions and related special findings occurred during a retrial.

In the published portion of this opinion, we discuss two issues. First, we evaluate whether the advisement of rights given by detectives to defendant, who was in custody, complied with the holding of *Miranda v. Arizona* (1966) 384 U.S. 436, 444-445 [86 S.Ct. 1602, 1612-1613, 16 L.Ed.2d 694, 10 A.L.R.3d 974]. We conclude the advisement of rights did not comply with *Miranda* but that the erroneous admission into evidence of defendant's confession was harmless error. Second, we discuss the question of whether defendant, who was obsessively stalking his estranged spouse, was entitled to voluntary manslaughter instructions on a heat of passion theory. We conclude he was not. We affirm the judgment.

### II. FACTUAL BACKGROUND

We begin by setting forth the general factual background. Later, while discussing the heat of passion instructional error issue, we will identify additional facts which relate more specifically to that question. Defendant and Monica Lujan were married. They had two sons together. In April 1998, Ms. Lujan and defendant separated. Ms. Lujan and their sons then moved in with her mother, Frances Velazquez. Defendant telephoned Ms. Lujan two or three times each day following their separation. In July 1998, Ms. Lujan returned to her mother's home at midnight after seeing a movie with Rachel Romero. Ms. Velazquez heard Ms. Lujan yell at defendant about being outside with their children that late at night. Defendant had the two boys in his car. The children were wearing only their underwear. Ms. Lujan telephoned Ms. Romero later that night. Ms. Lujan was upset and crying. Ms.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Romero suggested that Ms. Lujan document what was occurring with defendant. The following day, Ms. Lujan showed Ms. Romero the notes concerning the troubled relationship.

On July 17, 1998, defendant went to Ms. Velazquez's home. Defendant was scheduled to care for their youngest son, Adrian, for the weekend. Ms. Lujan was going to Las Vegas with family members. Defendant suggested that he and Ms. Lujan go to Las Vegas with their children. Ms. Lujan told defendant that she wanted "nothing to do with him." Despite Ms. Lujan's repeated requests that he leave, defendant refused to do so. Defendant called to her several times from outside Ms. Velazquez's home. Two deputy sheriffs from the Norwalk station arrived at Ms. Velazquez's home. They told defendant that he was not wanted on the premises because he had previously been reported for harassment of Ms. Lujan.

When Ms. Lujan's family arose to travel to Las Vegas the next morning, she saw defendant's car parked down the street. Defendant followed Ms. Velazquez's car. Defendant yelled at Ms. Lujan. Someone in Ms. Velazquez's car telephoned the sheriff's station. They reported that defendant was harassing them. Defendant was driving in and out of lanes and following too closely. They feared that he would hit their car. Ms. Velazquez was told to drive to the sheriff's station. Once at the station, defendant continued to yell at Ms. Lujan. He told her: "You're never going to get rid of me, Monica." Deputy Timothy Holt then spoke to both defendant and Ms. Lujan. Ms. Lujan told Deputy Holt that since their separation, defendant had made several disturbing phone calls and followed her. During the previous week, Ms. Lujan had noticed defendant's car parked near her home and work. Ms. Lujan had also seen defendant standing outside her work address waiting for her. Ms. Lujan told Deputy Holt that she had told defendant to leave her alone or she would obtain a restraining order. Defendant responded: "Go ahead. That is, if you're still alive." Ms. Lujan told Deputy Holt that defendant had simulated a gun with his fingers and placed it to her head saying, "This is going to be you." Ms. Lujan also stated that defendant had attempted to choke her when they separated five years earlier. Defendant told Ms. Lujan, "I'll kill you if you try to leave me."

Defendant also spoke with Deputy Holt. Defendant said he and his wife were just arguing. Defendant appeared strange to Deputy Holt. Defendant would not look at Deputy Holt. He stared at Ms. Lujan. Defendant acknowledged that there had been domestic violence in the past but did not elaborate. Defendant was arrested for making terrorist threats and stalking. Deputy Holt wrote a nine-page report regarding the incident.

On July 20, 1998, Sergeant Terri Williams telephoned defendant at work following his release from custody. Sergeant Williams advised defendant

several times to stay away from Ms. Lujan. Defendant made light of Sergeant Williams's warnings. Sergeant Williams also spoke with Ms. Lujan the same day. Sergeant Williams explained the procedure for obtaining a restraining order. Ms. Lujan told Sergeant Williams that defendant threatened: "It's not over until I say so. You will not win."

Thereafter, defendant's phone calls to Ms. Lujan increased. On August 5, 1998, Deputy Holt drove past the Velazquez home. Ms. Lujan walked out to Deputy Holt's patrol car. She told Deputy Holt that she had filed for divorce. She was fearful that defendant would "blow up." On August 8, 1998, defendant was waiting in front of the Velazquez home when Ms. Lujan and Ms. Romero returned from a wedding at approximately 2:00 a.m. Ms. Lujan ran inside to call the authorities. Defendant jumped out of his car. He chased Ms. Lujan as she ran. Mr. Velazquez asked defendant to leave. Defendant jumped up and down on the hood of his car. Defendant then got inside the car and left. Ms. Romero found Ms. Lujan inside. Ms. Lujan was crying and shaking. Defendant called the Velazquez residence while the deputies were present. Deputy Michael Van spoke to defendant by telephone. Deputy Van told defendant to stay away from Ms. Lujan's home. Defendant was advised he would be arrested if he did not stay away from Ms. Lujan.

On August 10, 1998, Deputy Holt informed Sergeant Williams about the August 8, 1998, incident. Sergeant Williams telephoned defendant. She also warned defendant about following or bothering Ms. Lujan. Defendant stated, "I just wanted to talk to her." Sergeant Williams told defendant: "[S]he is scared of you, stay away from her, do not harass her, don't contact her, don't call her, get an attorney, contact her through an attorney. She's afraid of you. If you contact her anymore, if I hear from her or another deputy sheriff that you have contacted her, I will personally come over and arrest you for stalking her." Defendant telephoned Sergeant Williams on August 13, 1998. Defendant acknowledged that he should not be bothering his wife. Defendant said he would not call or bother Ms. Lujan again.

On August 15, 1998, Ms. Lujan's family gathered to watch a professional prize fight on television. Ms. Lujan's brothers then played pool in the garage. Deputy Sheriff Gilbert Madrigal, a neighbor, was invited to join them. Deputy Madrigal stayed at the Velazquez home for approximately one hour. Deputy Madrigal and Ms. Lujan walked to his home two houses away. Ms. Velazquez remained on her porch to watch for defendant's car. Ms. Velazquez walked down to her front gate approximately four times between 12:15 and 1:35 a.m. Each time, she saw Ms. Lujan and Deputy Madrigal talking on the sidewalk in front of his home. Ms. Velazquez went inside at 1:35 a.m. and fell asleep. She had not seen defendant or his car.

At approximately 2:52 a.m. on August 16, 1998, Deputy Holt received an emergency call regarding a possible burglary at the house between the Velazquez home and that of Deputy Madrigal. Upon arriving, Deputy Holt saw the bodies of two individuals in the driveway area. Deputy Holt recognized Ms. Lujan as one of the victims. He was unable to detect any pulse or sign of life. The other victim was Deputy Madrigal, who had suffered a severe head injury. The blood from the injury appeared coagulated, suggesting that Deputy Madrigal had been lying there for some time. Deputy Madrigal was moaning for help. Deputy Holt instructed another arriving deputy to set up a containment of defendant's house. Deputy Holt went to defendant's home. Deputy Holt saw defendant's car parked across the street. Deputy Holt and another deputy secreted themselves in the nearby bushes. Defendant ran out of the house to his car. Defendant grabbed something out of the car and placed it in the waistband of his pants. Defendant then ran back into the house. A short time later, all occupants were ordered to come out of defendant's house. Defendant was then arrested.

Defendant's brother, George Lujan, testified as to defendant's conduct during the early morning hours of August 16, 1998. After 2:00 a.m., Mr. Lujan entered the kitchen of defendant's residence. Thereupon, defendant "turned around and went into his bedroom." Mr. Lujan described defendant as "very agitated." Defendant was pacing and "acting a little weird." Mr. Lujan testified as follows: "I asked him what was the matter. And first, he didn't really respond, and I just kept following him around the house, and he said he thought that he got into a fight with [Ms. Lujan]." At another point, Mr. Lujan testified that defendant said, "[H]e thought he hurt [Ms. Lujan]." Despite the fact that he thought he might have "hurt" Ms. Lujan, defendant made no effort to telephone her to verify her condition. Mr. Lujan had seen defendant earlier on the evening of August 15, 1998. Since then, defendant had changed clothes. After defendant's arrest, Mr. Lujan related the foregoing facts to sheriff's detectives.

Defendant was interviewed by Sergeants Reinaldo Rodriguez and Craig Melvin at the Norwalk Sheriff's station. Defendant initially stated that he first learned of Ms. Lujan's death when informed by sheriff's deputies. He denied any involvement in the murders of Ms. Lujan and Deputy Madrigal. Defendant continued to deny he was involved in the killing during a continuation of the interview a short time later that day.

At 5:40 p.m., Sergeant Rodriguez once again met with defendant. Defendant related the following to Sergeant Rodriguez. Defendant saw Ms. Lujan walking with Deputy Madrigal at approximately midnight. Defendant hid behind a nearby truck. Defendant did not recall how long he waited near the

truck. He believed it was more than two minutes. Ms. Lujan and Deputy Madrigal could not see him where he was waiting. Defendant saw Deputy Madrigal touching Ms. Lujan's body. Defendant said, "I couldn't handle that." Ms. Lujan and Deputy Madrigal then walked into his home. Defendant believed they had sexual relations. Defendant stated, "And when he came to walk her home, I just, I just lost it." Defendant admitted that he grabbed a cement drain cap when he heard them come out the door. Defendant hit Deputy Madrigal with the cement drain cover first. Defendant then hit Ms. Lujan with the cement drain cap. Defendant indicated that he threw the cement cover in the bushes on the same side of the street near the end of the block. Defendant acknowledged that he willingly gave his statement without threat or harassment. Defendant also indicated that he wanted to make the statement without an attorney being present. Defendant stated he knew the statement would be used in court.

A cement water meter cover was found in the bushes in front of the last house on the block from the crime scene. The cement water meter cover had blood on it. Broken bits of cement found at the crime scene matched pieces missing from the larger piece of concrete. The cement cover measured 14½ inches by 9 inches by 2 inches. It weighed 15.5 pounds. The only cement water meter cover missing from the entire block was located near the large truck where defendant indicated he had waited. Defendant asked Kenny if Ms. Lujan was dating Deputy Madrigal. Kenny told defendant, "No."

During the interviews, defendant claimed not to know Deputy Madrigal. Defendant further denied ever having seen Deputy Madrigal before. However, defendant's son, Kenny, had met Deputy Madrigal. Kenny, who was 11 years old at the time of trial, knew Deputy Madrigal as "Officer Gil." On four or five occasions, defendant asked Kenny about Deputy Madrigal. Defendant asked Kenny if Ms. Lujan was dating Deputy Madrigal. Kenny told defendant, "No." Defendant, while testifying, admitted beating both Ms. Lujan and Deputy Madrigal to death with the cement water meter cover.

While testifying, defendant admitted asking Kenny on four occasions whether Ms. Lujan: dated Deputy Madrigal; talked to Deputy Madrigal; or went to Deputy Madrigal's house. Defendant stated Kenny said "[Y]es." Defendant acknowledged that after the July 17, 1998, incident, he had participated in anger management counseling, "because I needed the help."

Both victims died as the result of multiple blows to their heads consistent with having been inflicted by a 15-pound cement block. Neither victim appeared to have defensive wounds. Deputy Madrigal was in a coma for a week before his death.

## III. DISCUSSION

### A. *Admissibility of Defendant's Statements*

 Defendant argues that the trial court improperly admitted evidence of his statements in violation of the rule adopted by the majority in *Miranda v. Arizona, supra,* 384 U.S. at pages 444-445 [86 S.Ct. at pages 1612-1613]. Among other things defendant argues, the *Miranda* warning was inadequate. As a result, he argues his conviction should be reversed. Defendant does not argue his confession was involuntary.

Transcripts of the audiotape recordings of defendant's three interviews were reviewed at a hearing conducted pursuant to Evidence Code section 402, outside the jurors' presence. They revealed that in an effort to comply with the *Miranda* decision the following warning was given prior to the first interview at 7:35 a.m. on Sunday August 16, 1998, "Your rights are you have the right to remain silent. [¶] Whatever we talk about, and you say, can be used in a court of law, against you. [¶] And if you don't have money to hire an attorney, one's appointed to represent you free of charge. So those are your rights." Defendant indicated that he understood those rights. Thereafter defendant stated that he was not involved in any altercations with Ms. Lujan or anyone else the previous evening. The interview was terminated at 9:05 a.m. A second audiotaped interview, referenced as a continuation of the first, commenced at some time later. The second interview ended at 10:36 a.m. Defendant was told the two sergeants would speak with him again following the search of his car and home.

Meanwhile, defendant's aunt contacted a lawyer, John A. McDonald. Mr. McDonald was representing defendant in connection with a spousal abuse misdemeanor charge pending in the Downey Municipal Court resulting from a prior incident involving Ms. Lujan. Between 2:45 p.m. and 3:30 p.m. on Sunday, August 16, 1998, Mr. MacDonald telephoned the Norwalk's Sheriff's Station and spoke with one of the detectives investigating the killings of Ms. Lujan and Deputy Madrigal. Mr. McDonald described the conversation as follows, "[T]he person I spoke to said he was one of the detectives assigned in the case . . . ." Mr. MacDonald described his conversation with the detective as follows: "I said I am John McDonald, I represent Mr. Lujan, please do not speak to him. I'm asserting his rights. [¶] I was told Mr. Lujan was being interrogated at that point. Again, it could have been 2:45, it could have been 3:30." Mr. McDonald was given no assurances by the investigator at the Norwalk's Sheriff's Station concerning any present or future interviews of defendant. Mr. McDonald was ill and unable to go to the Norwalk Sheriff's Station. Therefore, Mr. McDonald arranged for another lawyer,

Jeffrey Gold, to go to the Norwalk Sheriff's Station. Mr. MacDonald described his conversation with Mr. Gold as follows, "[Mr. Gold] said . . . I'll go down there and I'll talk to Mr. Lujan and basically tell him to shut up."

At 5:40 p.m., Sergeant Rodriguez met with defendant to continue the interview. Sergeant Rodriguez summarized what was found at defendant's home. Defendant then inquired, "Can I have an attorney present?" Sergeant Rodriguez responded: "You want, you want an attorney present? You feel you need one?" Defendant said, "Yes I do." Sergeant Rodriguez stated: "Okay. All right. If that's what you want to do, we'll do that." Defendant asked if he could get an attorney the same day. Sergeant Rodriguez told defendant: "I really doubt it. I mean I'm going to be honest with you. It's Sunday evening. When you go to court in a couple of days there will be one appointed for you. That's the way the system is set up. If you have funds and you want to call and hire your own attorney. If you want to call and hire an attorney, that's fine. We've tried to deal with you fair. I realize I was bad, I mean, not bad, I was pissed off and I got upset. A lot of that had to do because it was a deputy involved, a deputy involved situation. I shouldn't have been there, doing that, but I was. I've handled other deputy situations, it's just that this one, it just kind of, I knew the guy. So like I said it's up to you. So [if you] want to make a statement without an attorney, that's up to you. I doubt that if you hire an attorney they'll let you make a statement, usually they don't. That's the way it goes. So, that's your prerogative, that's your choice. If you do want to talk to me without an attorney, that's your choice. You can just tell the jailer, 'hey, I'd like to talk to the detectives without an attorney present.' Okay. That's your choice."

Thereafter, defendant asked if he could make a phone call. Sergeant Rodriguez attempted to place the call for defendant on the telephone in the interview room. However, Sergeant Rodriguez was unable to make an outside call from that telephone. Defendant asked if he could call from the telephones in the jail area. Sergeant Rodriguez said that the jailer would move defendant. Sergeant Rodriguez also told defendant, "If you decide, after you make those calls, that you want to talk to us . . . ." Defendant interjected, "Yeah, I do want to talk to you." Sergeant Rodriguez asked if defendant wanted to talk without an attorney. Defendant responded, "Ummm." However, defendant indicated he wanted to wait until after he made his telephone calls.

Sergeant James Tippings escorted defendant from the interview room to the telephones in the booking area. After a few minutes, defendant spoke to Sergeant Tippings. Defendant said he was unable to reach anyone by telephone. Sergeant Tippings testified that the following then occurred, "I asked

him if I was taking him back to the cell in the back or to speak with the detectives." Defendant responded, "To speak with the detectives." Pursuant to his request, defendant was returned to the interview room. Sergeant Tippings described what happened as follows, "I advised Sergeant Rodriguez that [defendant] wanted to talk to him."

When Sergeant Rodriguez returned to the interview room, he noted that defendant appeared to have been crying. Sergeant Rodriguez inquired: "You want to tell me everything? Okay. All right. Now, you've asked for an attorney, so if you want to talk about this, you'll have to tell me without an attorney present. Is that your desire then? Speak up, you have to speak up." Defendant requested a tissue. Sergeant Rodriguez asked defendant: "You understand, you know, you said that you, you wanted to tell me what happened. We've treated you fair, nobody's threatened you or anything of that nature . . . have we?" Defendant responded, "No." Sergeant Rodriguez asked defendant: "Okay. And you want to make a voluntary statement now without an attorney and tell me everything?" Defendant said, "Yes." Defendant then explained how he killed Ms. Lujan and Deputy Madrigal. The interview ended at 6:36 p.m.

The precise time Mr. Gold, the attorney sent by Mr. McDonald, arrived at the Norwalk's Sheriff's Station is unclear. Sergeant Tippings briefly spoke with an attorney at the counter at the Norwalk's Sheriff's Station. This brief discussion occurred after Sergeant Tippings took defendant from the telephone area to the interview room to speak with Sergeant Rodriguez. Sergeant Rodriguez was unaware that Mr. McDonald telephoned requesting that defendant not be interviewed.

Defendant argues that there was noncompliance with the prophylactic rule of *Miranda v. Arizona, supra,* 384 U.S. at pages 444-445 [86 S.Ct. at pages 1612-1613]. Defendant contends that he was never advised of the right to have counsel present *before* and *during* questioning. Defendant is correct that the *Miranda* warnings must advise an accused of the right to have an attorney present before and during questioning. (*Fare v. Michael C.* (1979) 442 U.S. 707, 717-718 [99 S.Ct. 2560, 2567-2568, 61 L.Ed.2d 197]; *Miranda v. Arizona, supra,* 384 U.S. at pp. 473-474 [86 S.Ct. at pp. 1627-1628].) In *Duckworth v. Eagan* (1989) 492 U.S. 195, 204 [109 S.Ct. 2875, 2881, 106 L.Ed.2d 166], the Supreme Court held, "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning . . . ." (Fn. omitted; accord, *People v. Nitschmann* (1995) 35 Cal.App.4th 677, 682 [41 Cal.Rptr.2d 325].) Further, in *Duckworth,* the court held: "Reviewing courts . . . need not examine *Miranda* warnings as if construing

a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda.*' ([*California v.*] *Prysock* [(1981)] 453 U.S. [355,] 361 [101 S.Ct. 2806, 2810, 69 L.Ed.2d 696].)" (*Duckworth v. Eagan, supra,* 492 U.S. at p. 203 [109 S.Ct. at p. 2880].)

The Attorney General argues that the *Miranda* warnings in this case were satisfactory. The Attorney General relies on decisions which hold that the *Miranda* admonition need not be given in a precise form and that there is " 'no talismanic incantation' " that must be followed in advising an accused of her or his rights prior to in-custody questioning by the authorities. (*Duckworth v. Eagan, supra,* 492 U.S. at pp. 202-203 [109 S.Ct. at pp. 2879-2880], citing *California v. Prysock, supra,* 453 U.S. at p. 359 [101 S.Ct. at p. 2809].) The Attorney General relies upon the following decisions to support the contention that the *Miranda* warnings in the present case suffi- ciently advise defendant of his right to counsel before and during question- ing: *Duckworth v. Eagan, supra,* 492 U.S. at pages 202-203 [109 S.Ct. at pages 2879-2880]; *California v. Prysock, supra,* 453 U.S. at pages 359-360 [101 S.Ct. at pages 2809-2810]; and *People v. Wash* (1993) 6 Cal.4th 215, 236-237 [24 Cal.Rptr.2d 421, 861 P.2d 1107]. We examine each of these cases in detail. As will be noted, in each of the three cases relied upon by the Attorney General, at some point in the *Miranda* advisements, the accused was told directly or indirectly of the right to have counsel present before or during in-custody questioning by state officials.

In *Duckworth,* the United States Supreme Court described in the admoni- tions provided to the defendant in some detail. At 11:00 a.m. on May 17, 1982, the defendant was read the following admonition of rights: " 'Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. *You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.* You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer.' [Citation.]" (*Duckworth v. Eagan, supra,* 492 U.S. at pp. 197-198 [109 S.Ct. at pp. 2877-2878], original italics.) The defendant then signed the form and gave an exculpatory statement. (*Ibid.*)

Twenty-nine hours later, on May 18, 1982, the defendant was once again interrogated. Before speaking with the police officers, the defendant was

read the following waiver form: "Before this questioning, one of the officers read the following waiver form to respondent: [¶] '1. Before making this statement, I was advised that I have the right to remain silent and that anything I might say may or will be used against me in a court of law. [¶] '2. That I have the right to consult with an attorney of my own choice before saying anything, and that an attorney may be present while I am making any statement or throughout the course of any conversation with any police officer if I so choose. [¶] '3. That I can stop and request an attorney at any time during the course of the taking of any statement or during the course of any such conversation. [¶] '4. That in the course of any conversation I can refuse to answer any further questions and remain silent, thereby terminating the conversation. [¶] '5. That if I do not hire an attorney, one will be provided for me.' " (*Duckworth v. Eagan, supra,* 492 U.S. at pp. 198-199 [109 S.Ct. at p. 2878].) The defendant then read the admonition back to the officers. The defendant then signed the waiver form and confessed. (*Id.* at p. 199 [109 S.Ct. at p. 2878].) As can be noted the first admonition given on May 16, 1982, indicated a lawyer could not be provided until the defendant appeared in court. (*Id.* at p. 198 [109 S.Ct. at pp. 2877-2878].)

In *Prysock,* the other United States Supreme Court case relied upon by the Attorney General, the evidence concerning the admonition of rights was as follows: " 'Sgt. Byrd: . . . Mr. Randall James Prysock, earlier today I advised you of your legal rights and at that time you advised me you did not wish to talk to me, is that correct? [¶] 'Randall P.: Yeh. [¶] 'Sgt. Byrd: And, uh, during, at the first interview your folks were not present, they are now present. I want to go through your legal rights again with you and after each legal right I would like for you to answer whether you understand it or not. . . . Your legal rights, Mr. Prysock, is [*sic*] follows: Number One, you have the right to remain silent. This means you don't have to talk to me at all unless you so desire. Do you understand this? [¶] 'Randall P.: Yeh. [¶] 'Sgt. Byrd: If you give up your right to remain silent, anything you say can and will be used as evidence against you in a court of law. Do you understand this? [¶] 'Randall P.: Yes. [¶] 'Sgt. Byrd: You have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during the questioning. Do you understand this? [¶] 'Randall P.: Yes.' " (*California v. Prysock, supra,* 453 U.S. at pp. 356-357 [101 S.Ct. at p. 2808].) After the foregoing admonition in *Prysock,* there was a discussion with the accused's parents, who were in attendance, concerning whether they desired to have an attorney present before questioning. (*Id.* at p. 357 [101 S.Ct. at p. 2808].) As can be noted, in both *Duckworth* and *Prysock,* the defendants were specifically advised of the right to have counsel present during any questioning. In the present case, no such admonition was given either directly or inferentially.

Further, the present case is unlike *People v. Wash, supra,* 6 Cal.4th at page 236, the third decision relied upon by the Attorney General. In *Wash,* the defendant was advised in part, "[Y]ou have the right to have an attorney present before any questioning if you wish one, if you cannot—if you cannot afford . . . an attorney[,] one will be provided to you at no cost before any questioning begins. . . ." (*Ibid.*) Quite obviously, in *Wash,* the accused was advised twice about the right to have an attorney "before any questioning." (*Ibid.*) *Wash* stands for the proposition that there is sufficient compliance with *Miranda* if the accused is advised of the right to have an attorney present before questioning. (See 5 Witkin, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 120, pp. 196-198.) The analysis in *Wash* is entirely consistent with the United States Supreme Court's holding that the test for reviewing the adequacy of an advisement to an arrestee "is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda.*' " (*Duckworth v. Eagan, supra,* 492 U.S. at p. 203 [109 S.Ct. at p. 2880], citing *Prysock v. California, supra,* 453 U.S. at p. 361 [101 S.Ct. at p. 2810].) Further, the *Miranda* discussion in *Wash* makes perfect sense. The defendant in *Wash* was twice told he could have an attorney prior to any questioning. It is unreasonable to conclude that if counsel was present before questioning that the attorney would be excluded from the interrogation room once the interview began. That is why the warning in *Wash* reasonably conveyed to the defendant his right to have an attorney present during questioning. Any other inference to be drawn from the *Wash* warning, e.g., that the right to counsel exists only before but not during questioning would be unreasonable to say the least. (*People v. Kelly* (1990) 51 Cal.3d 931, 947-949 [275 Cal.Rptr. 160, 800 P.2d 516] [*Miranda* warnings which only mentioned the right to an attorney during questioning but not before the commencement of interrogation reasonably conveyed to the defendant his right to counsel]; *People v. Nitschmann, supra,* 35 Cal.App.4th at pp. 682-683 [detective's inquiry "[y]ou understand you have a right to speak to an attorney" coupled with recidivist defendant's desire to immediately speak complied with *Miranda*].) Here, defendant was never advised of his right to have an attorney present before or during questioning.

Finally, the offhand discussion concerning the unavailability of appointed counsel on a Sunday evening did not comply with the *Miranda* requirement that the warning reasonably convey the right to have counsel before and during in custody questioning. No doubt, advising an accused that appointed counsel is presently unavailable does not violate *Miranda.* (*Duckworth v. Eagen, supra,* 492 U.S. at pp. 198-204 [109 S.Ct. at pp. 2877-2881].) In *Duckworth,* the Supreme Court noted that accurately explaining how the appointed counsel process operates does not contravene *Miranda.* (*Id.* at pp. 203-204 [109 S.Ct. at pp. 2880-2881].) However, in *Duckworth,* the defendant was twice advised of the right to counsel before and during questioning.

Such never occurred in the present case. In the present case, the *only* advice concerning the presence of appointed counsel related to defendant was that an assigned attorney was unavailable on Sunday evening when the final interview occurred. Defendant was never advised he had the right to appointed counsel before any questioning could occur and that attorney could be present during the interview. The same is true in terms of retained counsel. Hence, all of defendant's inculpatory statements were inadmissible during the prosecution's case-in-chief. (*New York v. Quarles* (1984) 467 U.S. 649, 655, fn. 5 [104 S.Ct. 2626, 2637, 81 L.Ed.2d 550]; *Miranda v. Arizona*, *supra*, 384 U.S. at pp. 444-445 [86 S.Ct. at pp. 1612-1613].)

We must determine the prejudicial effect of the error using the harmless beyond a reasonable doubt test of *Chapman v. California* (1967) 386 U.S. 18, 21-22 [87 S.Ct. 824, 826-827, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 292 [111 S.Ct. 1246, 1255-1256, 113 L.Ed.2d 302].) Defendant testified at trial. The contents of his testimony were virtually the same as those of his confession. Nothing defendant said in his confession added to the quantum of guilt on any issue beyond that contained in his in-court testimony before the jury. The error was entirely harmless.

At oral argument, defendant argued that his courtroom testimony was the product of his inadmissible confession. Hence, defendant reasons that his conviction must be reversed under the dictates of *Miranda* because his testimony before the jury was the product of the trial court's erroneous denial of his motion to suppress his confession. For purposes of discussion, we will assume that the decision to testify was made in response to the trial court's ruling denying defendant's pretrial motion to suppress his inculpatory statements.

Even if defendant's decision to testify was in response to the trial court's ruling on the motion to suppress his confession, *Miranda* would not permit reversal. ▮ No doubt, in the case of Fourth Amendment violations, derivative evidence resulting from an unlawful search or seizure may be inadmissible. (*Wong Sun v. United States* (1963) 371 U.S. 471, 484-486 [83 S.Ct. 407, 415-417, 9 L.Ed.2d 441]; *Krauss v. Superior Court* (1971) 5 Cal.3d 418, 422 [96 Cal.Rptr. 455, 487 P.2d 1023], overruled on another point in *People v. Cook* (1978) 22 Cal.3d 67, 98, fn. 17 [148 Cal.Rptr. 605, 583 P.2d 130].) However, the United States Supreme Court has held that similar derivative evidence rules do not apply in the *Miranda* context.

The possible application of the so-called "fruit of the poisonous tree" rule in the *Miranda* context was originally discussed by the United States Supreme Court in *Michigan v. Tucker* (1974) 417 U.S. 433, 447-448 [94 S.Ct.

2357, 2365-2366, 41 L.Ed.2d 182]. In *Tucker*, the issue was posited by the United States Supreme Court as follows: "This case presents the question whether the testimony of a witness in respondent's state court trial for rape must be excluded simply because police had learned the identity of the witness by questioning respondent at a time when he was in custody as a suspect, but had not been advised that counsel would be appointed for him if he was indigent. The questioning took place before this Court's decision in *Miranda* v. *Arizona[, supra,]* 384 U. S. [at p.] 436 . . . , but respondent's trial, at which he was convicted, took place afterwards. Under the holding of *Johnson* v. *New Jersey* [(1966)] 384 U. S. 719 [86 S.Ct. 1772, 16 L.Ed.2d 882], therefore, *Miranda* is applicable to this case." (*Michigan v. Tucker*, supra, 417 U.S. at p. 435 [94 S.Ct. at p. 2359].) The Supreme Court held that the testimony of a witness, Robert Henderson, could not be suppressed when his identity was ascertained solely as a result of a *Miranda* violation. The Supreme Court held: "We have recently said, in a search-and-seizure context, that the exclusionary rule's 'prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.' *United States* v. *Calandra* [(1974)] 414 U. S. 338, 347 [94 S.Ct. 613, 619-620, 38 L.Ed.2d 561]. We then continued: ' "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins* v. *United States* [(1960)] 364 U. S. 206, 217 [80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669].' [(*United States v. Calandra, supra,* 414 U.S. at p. 347 [94 S.Ct. at p. 620]).] In a proper case this rationale would seem applicable to the Fifth Amendment context as well. [¶] The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force. [¶] We consider it significant to our decision in this case that the officers' failure to advise respondent of his right to appointed counsel occurred prior to the decision in *Miranda*. Although we have been urged to resolve the broad question of whether evidence derived from statements taken in violation of the *Miranda* rules must be excluded regardless of when the interrogation took place, we instead place our holding on a narrower ground. For at the time respondent was questioned these police officers were guided, quite rightly, by the principles established in *Escobedo* v. *Illinois* [(1964)] 378 U. S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], particularly focusing on the suspect's opportunity to have retained counsel with him during the interrogation if he chose to do so. Thus,

the police asked respondent if he wanted counsel, and he answered that he did not. The statements actually made by respondent to the police, as we have observed, were excluded at trial in accordance with *Johnson* v. *New Jersey*[, *supra,*] 384 U.S. 719 . . . . Whatever deterrent effect on future police conduct the exclusion of those statements may have had, we do not believe it would be significantly augmented by excluding the testimony of the witness Henderson as well." (*Michigan v. Tucker, supra,* 417 U.S. at pp. 446-448 [94 S.Ct. at pp. 2365-2366], fns. omitted.) As can be noted, *Tucker* involved the situation where the interrogation occurred prior to *Miranda.* However, *Tucker* concluded that the effect of a *Miranda* violation did not extend so as to exclude the testimony of Mr. Henderson, a witness, whose identity was determined solely from the constitutionally improper questioning of the defendant. (See *Oregon v. Elstad* (1985) 470 U.S. 298, 308 [105 S.Ct. 1285, 1292-1293, 84 L.Ed.2d 222]; *Howard v. Moore* (4th Cir. 1997) 131 F.3d 399, 413.).

The first time the derivative evidence rule was discussed by the United States Supreme Court in the context of a post-*Miranda* interrogation was in *Oregon v. Elstad, supra,* 470 U.S. at pages 300-314 [105 S.Ct. at pages 1288-1296]. In *Elstad,* the accused was taken into custody for *Miranda* purposes in his residence and, without an advisement of rights, made an inculpatory statement. Prior to being taken to the sheriff's station, the accused was confronted by a detective who testified: " 'I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, *"Yes, I was there."* ' " (*Id.* at p. 301 [105 S.Ct. at p. 1289], italics added.) This inculpatory statement, " ' "Yes, I was there" ' " was made by the accused while still in his home. The accused was then taken to the sheriff's station. Approximately one hour later, the accused, after later being advised of his constitutional rights at the sheriff's station, gave a signed confession. (*Ibid.*; *U.S. v. Esquilin* (1st Cir. 2000) 208 F.3d 315, 319.)

During his court trial, the accused in *Elstad* moved to suppress his oral statement made in his home and written signed confession given at the sheriff's station. The Supreme Court described the arguments presented in the trial court as follows: "He contended that the statement he made in response to questioning at his house 'let the cat out of the bag,' citing *United States* v. *Bayer* [(1947)] 331 U. S. 532 [67 S.Ct. 1394, 91 L.Ed. 1654], and tainted the subsequent confession as 'fruit of the poisonous tree,' citing *Wong Sun* v. *United States*[, *supra,*] 371 U. S. 471 . . . . The judge ruled that the statement, 'I was there,' had to be excluded because the defendant had not been advised of his *Miranda* rights. The written confession taken

after Elstad's arrival at the Sheriff's office, however, was admitted in evidence." (*Oregon v. Elstad, supra,* 470 U.S. at p. 302 [105 S.Ct. at p. 1289].) The Oregon Court of Appeals reversed the ensuing burglary conviction on the ground that the signed confession given in the sheriff's station had been coerced by the prior statement, " ' "Yes, I was there" ' " made without the benefit of the *Miranda* warnings. (*Id.* at p. 303 [105 S.Ct. at pp. 1289-1290].)

The United States Supreme Court concluded that the traditional Fourth Amendment "fruit of the poisonous tree" constitutional jurisprudence does not apply in the case of a *Miranda* violation, so long as the subsequent statement following a proper warning and waiver was voluntary. The Supreme Court began its analysis by noting: "The arguments advanced in favor of suppression of respondent's written confession rely heavily on metaphor. One metaphor, familiar from the Fourth Amendment context, would require that respondent's confession, regardless of its integrity, voluntariness, and probative value, be suppressed as the 'tainted fruit of the poisonous tree' of the *Miranda* violation. A second metaphor questions whether a confession can be truly voluntary once the 'cat is out of the bag.' Taken out of context, each of these metaphors can be misleading. They should not be used to obscure fundamental differences between the role of the Fourth Amendment exclusionary rule and the function of *Miranda* in guarding against the prosecutorial use of compelled statements as prohibited by the Fifth Amendment." (*Oregon v. Elstad, supra,* 470 U.S. at pp. 303-304 [105 S.Ct. at p. 1290].)

Later in *Elstad,* the Supreme Court noted the distinction between the Fourth Amendment and a *Miranda* violation. The court stated: "But as we explained in [*New York v.*] *Quarles*[*, supra,* 467 U.S. at p. 654 [104 S.Ct. at pp. 2630-2631]] and [*Michigan v.*] *Tucker*[*, supra,* 417 U.S. at p. 444 [94 S.Ct. at pp. 2363-2364]], a procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine. The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits. *Dunaway* v. *New York* [(1979)] 442 U. S. 200, 216-217 [99 S.Ct. 2248, 2258-2259, 60 L.Ed.2d 824]; *Brown* v. *Illinois* [(1975)] 422 U.S. [590], 600-602 [95 S.Ct. 2254, 2260-2261, 45 L.Ed.2d 416]. 'The exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth.' ([*Brown v. Illinois, supra,* 422 U.S. at p. 601 [95 S.Ct. at pp. 2260-2261]].) Where a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. *Taylor* v. *Alabama* [(1982) 457 U.S. 687,]

690 [102 S.Ct. 2664, 2666-2667, 73 L.Ed.2d 314]. Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation. [¶] The *Miranda* exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*. Thus, in the individual case, *Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm. [Citations.]" (*Oregon v. Elstad, supra,* 470 U.S. at pp. 306-307 [105 S.Ct. at pp. 1291-1292], original italics, fn. omitted.)

As a result, the Supreme Court concluded that so long as the subsequent in custody statement is voluntarily made, it is admissible. The court concluded: ". . . If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." (*Oregon v. Elstad, supra,* 470 U.S. at p. 309 [105 S.Ct. at p. 1293].)

The United States Supreme Court confirmed the foregoing analysis in *Dickerson v. United States* (2000) 530 U.S. 428, 441 [120 S.Ct. 2326, 2334-2335, 147 L.Ed.2d 405]. In *Dickerson,* the Supreme Court invalidated title 18 United States Code section 3501[2] which purported to overturn the *Miranda* majority's analysis. The Supreme Court discussed the opinion filed

---

[2]Title 18 United States Code section 3501 states: "(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances. [¶] (b) The trial judge in

by the Fourth Circuit Court of Appeals which concluded that the *Miranda* decision was not a constitutional holding and therefore Congress could, by enacting of title 18 United States Code section 3501, legislate a different standard for determining the admissibility of the statements made by in-custody defendants in criminal prosecutions. The Supreme Court in *Dickerson* noted: "These decisions illustrate the principle—not that *Miranda* is not a constitutional rule—but that no constitutional rule is immutable. No court laying down a general rule can possibly foresee the various circumstances in which counsel will seek to apply it, and the sort of modifications represented by these cases are as much a normal part of constitutional law as the original decision. [¶] The Court of Appeals also noted that in *Oregon* v. *Elstad*[, *supra*,] 470 U. S. 298 . . . , we stated that ' "[t]he *Miranda* exclusionary rule . . . serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself." ' [*United States v. Dickerson* (1999)] 166 F.3d [667,] 690 (quoting [*Oregon v.*] *Elstad, supra*, [470 U.S.] at [p.] 306). Our decision in that case—refusing to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases—does not prove that *Miranda* is a nonconstitutional decision, but simply recognizes the fact that unreasonable

---

determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession. [¶] The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession. [¶] (c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided*, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer. [¶] (d) Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention. [¶] (e) As used in this section, the term 'confession' means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing." (Original italics.)

searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." (*Dickerson v. United States, supra*, 530 U.S. at p. 441 [120 S.Ct. at pp. 2334-2335].) *Dickerson* makes it clear that the fruit of the poisonous tree doctrine does not apply in the *Miranda* context when the subsequent statement follows a proper warning and waiver and is voluntary given the holding in *Elstad.*

 In the present case, defendant confessed on August 16, 1998. He testified during his retrial on February 9, 2000. There is no contention nor evidence the August 16, 1998, Norwalk Sheriff's Station confession was involuntary; it merely resulted from a *Miranda* violation. Defendant was represented by counsel at the preliminary examination and during the trial and retrial. There is no evidence defendant's decision to testify at the retrial was involuntary. In fact, during the initial trial which resulted in a mistrial, defendant testified. Defendant's argument that his voluntary testimony during the retrial was the product of his inadmissible confession and, as such he is entitled to a reversal of the judgment, is without merit. (*People v. Brewer* (2000) 81 Cal.App.4th 442, 453-454 [96 Cal.Rptr.2d 786]; *People v. Simpson* (1998) 65 Cal.App.4th 854, 860, fn. 2 [76 Cal.Rptr.2d 851]; *People v. Whitfield* (1996) 46 Cal.App.4th 947, 957-959 [54 Cal.Rptr.2d 370]; see *People v. Samoyoa* (1997) 15 Cal.4th 795, 831 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

One final comment is in order. Defendant adverts to the harmless error analysis in *Arizona v. Fulminante, supra*, 499 U.S. at page 310 [111 S.Ct. at page 1265], which states, "When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt." Defendant argues we cannot consider his in-court testimony. The review of the "remainder of the evidence" in this case must include defendant's testimony. As noted previously, it is irrelevant in terms of the issues raised on direct appeal whether defendant's decision to testify was motivated by the trial court's ruling on the *Miranda* issue; the fruit of the poison tree doctrine is inapplicable in this situation. Further, *Miranda* does not apply to in-court testimony. (*U.S. v. Melendez* (1st Cir. 2000) 228 F.3d 19, 22-24; *U.S. v. Kilgroe* (9th Cir. 1992) 959 F.2d 802, 804; *People v. Chandler* (1968) 262 Cal.App.2d 350, 354 [68 Cal.Rptr. 645].) Therefore, defendant's voluntary testimony made on February 9, 2000, while represented by a highly regarded, experienced, and competent criminal defense lawyer is part of the "remainder of the evidence" to use the words of the *Fulminante* majority that we must consider in evaluating the prejudicial impact of the erroneous admission into

evidence of the August 16, 1998, confession. While freely testifying, as was his right, defendant admitted he committed the brutal killings in this case; he said he did it. Under *Fulminante*, the erroneous ruling on the motion to suppress defendant's confession was, beyond a reasonable doubt, entirely harmless.

## B. *Voluntary Manslaughter Instruction*

Defendant argues that the trial court improperly refused to instruct the jury on voluntary manslaughter as a lesser included offense of murder utilizing a heat of passion theory. (§ 192, subd. (a); *People v. Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777]; *People v. Borchers* (1958) 50 Cal.2d 321, 328-329 [325 P.2d 97].) Defendant argues his depression over the breakup of his marriage obscured his reason. He further argues, "[A] reasonable jury could infer . . . the intense and high wrought emotions aroused by [the] shock of seeing his wife being intimate with another man and believing they then engaged in sexual intercourse had not had time to cool or subside by the time [he] struck [Deputy] Madrigal and then [Ms. Lujan]." Hence, defendant contends he was entitled to voluntary manslaughter instructions based upon heat of passion.

We begin our analysis by summarizing the law of voluntary manslaughter based on heat of passion. One caveat is in order. Our analysis is premised upon language in California Supreme Court cases decided prior to the decisions of *People v. Blakeley* (2000) 23 Cal.4th 82, 87-88, 90 [96 Cal.Rptr.2d 451, 999 P.2d 675] and *People v. Lasko* (2000) 23 Cal.4th 101, 107-108 [96 Cal.Rptr.2d 441, 999 P.2d 666], which addressed issues relating to a specific intent to kill as an element of voluntary manslaughter. (See *People v. Rios* (2000) 23 Cal.4th 450, 461, fn. 7 [97 Cal.Rptr.2d 512, 2 P.3d 1066].) The parties in this case have not briefed any issue concerning the effect of *Blakeley* and *Lasko* on voluntary manslaughter instructions based upon heat of passion. Rather, the issue is whether voluntary manslaughter instructions based upon heat of passion should have been given. As will be noted, the issue before us does not involve an intent to kill; by contrast the issues involved in this case relate to the absence of provocative conduct and whether defendant's actions can be categorized as those of an ordinary person of average disposition who has acted rashly without due deliberation or reflection. We address those questions and rely upon authority which discusses intentional killings in the voluntary manslaughter context without reference to *Blakeley* and *Lasko* which are unrelated to the issues presented to us.

The California Supreme Court summarized the applicable law concerning heat of passion as follows: " 'Murder is the unlawful killing of a human

being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)' (*People* v. *Barton* (1995) 12 Cal.4th 186, 199 [47 Cal.Rptr.2d 569, 906 P.2d 531].) Generally, the intent to unlawfully kill constitutes malice. (§ 188; *People* v. *Saille* (1991) 54 Cal.3d 1103, 1113 [2 Cal.Rptr.2d 364, 820 P.2d 588]; see *In re Christian S.* (1994) 7 Cal.4th 768, 778-780 [30 Cal.Rptr.2d 33, 872 P.2d 574].) 'But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense (see []*Christian S.*[, *supra*,] 7 Cal.4th 768; [*People* v.] *Flannel* [(1979)] 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]).' (*Barton, supra*, 12 Cal.4th at p. 199.) Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide (*ibid.*), voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder (*id.* at pp. 201-202)." (*People* v. *Breverman* (1998) 19 Cal.4th 142, 153-154 [77 Cal.Rptr.2d 870, 960 P.2d 1094], fn. omitted, italics omitted.) *Breverman* described the heat of passion theory as follows: "An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' (§ 192[, subd.] (a)), and is thus voluntary manslaughter . . . , if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' (*People* v. *Berry*[, *supra*,] 18 Cal.3d [at p.] 515 . . . , quoting *People* v. *Valentine* (1946) 28 Cal.2d 121, 139 [169 P.2d 1]; *People* v. *Borchers*[, *supra*,] 50 Cal.2d [at pp.] 328-329 . . . .) ' "[N]o specific type of provocation [is] required . . . ." ' ([*People* v.] *Wickersham* [(1982)] 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311], quoting *People* v. *Berry, supra*, 18 Cal.3d at p. 515.) Moreover, the passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' ([*People* v.] *Wickersham, supra*, at p. 327, quoting *People* v. *Berry, supra*, 18 Cal.3d at p. 515) other than revenge (*People* v. *Valentine, supra*, 28 Cal.2d at p. 139)." (*People* v. *Breverman, supra*, 19 Cal.4th at p. 163.) The California Supreme Court has emphasized heat of passion can *mitigate* the crime of murder thereby reducing it to that of voluntary manslaughter. (*People* v. *Rios, supra,* 23 Cal.4th at pp. 454, 459; *People* v. *Lasko, supra,* 23 Cal.4th at pp. 110-111.)

There are two elements of a heat of passion voluntary manslaughter which are at issue in this case. First, the provocation which incites the killer to act

in the heat of passion case must be caused by the victim or reasonably believed by the accused to have been engaged in by the decedent. (*People v. Lee* (1999) 20 Cal.4th 47, 59 [82 Cal.Rptr.2d 625, 971 P.2d 1001] (lead opn. of Baxter J.); *In re Thomas C.* (1986) 183 Cal.App.3d 786, 798 [228 Cal.Rptr. 430]; *People v. Spurlin* (1984) 156 Cal.App.3d 119, 125-126 [202 Cal.Rptr. 663]; e.g., *People v. Brooks* (1986) 185 Cal.App.3d 687, 693-694 [230 Cal.Rptr. 86].) Second, as noted previously, the provocation must be such as to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*People v. Lee, supra*, 20 Cal.4th at p. 59; *People v. Barton, supra*, 12 Cal.4th at p. 201.) We agree with the Attorney General that these two elements of heat of passion voluntary manslaughter are not present in this case which involves a husband compulsively stalking an estranged spouse.

Setting aside defendant's confession which was inadmissible, the undisputed evidence as to these two elements indicated the following. Defendant and Ms. Lujan had separated in April 1998. Ms. Lujan began living with her mother, Ms. Velazquez. On either July 16 or 17, 1998, Ms. Lujan told defendant that she wanted nothing to do with him. This occurred outside the Velazquez home where Ms. Lujan and her children were living. After the conversation, defendant remained outside the Velasquez residence. Defendant asked for Ms. Lujan to come outside. Defendant said, "I want to talk to you." Ms. Lujan kept telling defendant to leave. Defendant stated he was not going to leave. Sheriff's deputies were summoned. Two sheriff's deputies told defendant to leave.

The next morning, at 3:45 a.m., defendant began following Ms. Lujan as she and others were leaving the Velazquez residence on a trip to Las Vegas. Defendant pulled alongside Ms. Lujan and her companions. Defendant began yelling at them. At another point, he drove through a red light. Ms. Lujan's mother, Ms. Velazquez, drove to the Norwalk Sheriff's Station. While parked in the parking lot of the sheriff's station, defendant raised his fists and threatened a young man who was with Ms. Lujan. Deputy Holt interviewed defendant who admitted that there were incidents of domestic violence. During the conversation in the parking lot of the sheriff's station, defendant kept staring at Ms. Lujan. Defendant was arrested for stalking. Ms. Lujan was advised about the procedure for obtaining a restraining order.

After defendant posted bond and was released, on July 20, 1998, Sergeant Williams telephoned defendant. Sergeant Williams told defendant several times to stay away from Ms. Lujan. But defendant laughed and treated the subject lightly.

On August 5, 1998, Ms. Lujan indicated she had filed for divorce and that defendant would be served with "the papers" that day. On August 8, 1998,

Ms. Lujan and Ms. Romero arrived at the Velazquez residence. As the two women were hugging and saying good-bye in the car, defendant drove up almost striking Ms. Romero's automobile. Defendant's car parked "nose to nose" with Ms. Romero's car. Defendant's automobile was therefore parked on the wrong side of the street. Ms. Lujan ran towards the Velazquez residence. Defendant jumped out of his car and, after leaping over a fence, chased Ms. Lujan as she raced into the house. Ms. Lujan's parents and brother yelled at defendant to leave. Defendant, who was standing outside of the residence, began begging Ms. Lujan not to telephone the authorities. Two deputy sheriffs arrived after defendant had left the Velazquez residence. A deputy sheriff later spoke with defendant. The deputy described the conversation with defendant as follows: "I told him that the family was tired of him being at their house, he needed to stay away, he was going to end up getting himself into trouble, end up getting himself arrested if he didn't stay away from that house and from his wife." The deputy described defendant's response as follows, "He said it was going to be hard because that was his wife and he has kids and it was going to be a hard thing for him to do."

On August 10, 1998, Sergeant Williams once again telephoned defendant after learning about the August 8 incident. Sergeant Williams once again told defendant not to go to Ms. Lujan's residence. Sergeant Williams described the conversation in part as follows: "I told him she is scared of you, stay away from her, do not harass her, don't contact her, don't call her, get an attorney, contact her through an attorney. She's afraid of you. If you contact her anymore, if I hear from her or another deputy sheriff that you have contacted her, I will personally come over and arrest you for stalking her." On August 13, 1998, Sergeant Williams received a telephone call from defendant. Sergeant Williams described the conversation as follows: "[H]e to told me 'I'm sorry I've been such an asshole,' and those were his words. 'I'm sorry I've been such an asshole. I won't do this anymore. I know I shouldn't be bothering her, and I won't call her anymore or bother her anymore.'" During the conversation with Sergeant Williams, defendant acknowledged that he knew what he had done was wrong and how serious the matter was. Sergeant Williams did not perceive defendant's apologies to be sincere.

On Sunday, August 16, 1998, defendant began thinking about Ms. Lujan. While testifying at trial, defendant described his decision to drive to her residence as follows, "Then I thought about my wife and I got in my car and drove by her home." Despite the fact he been repeatedly directed not to go to Ms. Lujan's residence, defendant explained his decision to see her that night like this: "I just wanted to see if she was home at that time because I tried calling her on the—on her cell phone number which she gave me a couple of

days prior to, and it said out of area, so I assumed she was out of the area. So I just wanted to drive by her home just to see if she was home." Upon arriving near the Velazquez residence, defendant parked his car and, in his words, "walked down the city sidewalk." Defendant explained his choice of a place to park, which was some distance from the Velazquez residence, like this, "I wanted to get a better look to see if it was someone I knew or a car I recognized or somebody maybe I knew."

Defendant began to walk towards Deputy Madrigal and Ms. Lujan. Defendant's reaction was as follows, "I couldn't believe that my wife was there with another man." Defendant began to listen to them as they talked and Ms. Lujan said to Deputy Madrigal, "My dad really likes you." According to defendant, Deputy Madrigal responded, "Your dad seems like a nice guy." After watching Deputy Madrigal and Ms. Lujan become "intimate" defendant testified he was devastated. Defendant listened to their conversation in the darkness standing 20 or 25 feet away. Defendant continued to watch as Ms. Lujan and Deputy Madrigal walked into the backyard of the residence. Defendant then sat down next to some nearby trucks and waited. Defendant described his feelings as follows: "I started thinking about my kids and my wife. I started thinking about our wedding and my son's birth and when she told me she was pregnant the first time and the second time. I thought about my kids' first steps." Then the front door of Deputy Madrigal's residence opened. Deputy Madrigal and Ms. Lujan then walked out of the front door. Defendant testified that he then "lost control of all my actions" and thereupon killed Ms. Lujan and Deputy Madrigal with a concrete water meter cover.

We disagree with defendant that heat of passion voluntary manslaughter instructions can be given under these circumstances. To begin with, neither Ms. Lujan nor Deputy Madrigal engaged in provocative conduct so as to warrant heat of passion voluntary manslaughter instructions. (*People v. Lee*, *supra*, 20 Cal.4th at p. 59; *In re Thomas C.*, *supra*, 183 Cal.App.3d at p. 798.) It is not provocative conduct for a woman who has been separated from her estranged husband for four or five months and who has filed a petition for dissolution of marriage to later develop a romantic relationship with another individual. Other decisions are consistent with our conclusions concerning the provocation element in this case. In *People v. Dixon* (1995) 32 Cal.App.4th 1547, 1555-1556 [38 Cal.Rptr.2d 859], we held that the failure of a woman to engage in sexual conduct after having promised to do so in exchange for being given drugs was not a sufficient provocation to permit giving heat of passion manslaughter instructions to the jury. In *People v. Hyde* (1985) 166 Cal.App.3d 463, 473 [212 Cal.Rptr. 440], now retired Associate Justice Howard B. Weiner wrote that "extreme jealousy and

preoccupation" with a former girlfriend's new boyfriend did not constitute "sufficient provocation" so as to permit a jury to be presented with voluntary manslaughter instructions based on a heat of passion. Further, retired Associate Justice Weiner noted that the justices "refuse[d] to countenance any suggestion" that the new boyfriend's mere act of dating the defendant's former girlfriend constituted provocation in a voluntary manslaughter heat of passion context. (*Ibid.*; accord, *People v. Young* (1945) 70 Cal.App.2d 28, 36 [160 P.2d 132].)

Further, the present case is far different from the decision of the Supreme Court in *People v. Berry, supra,* 18 Cal.3d at pages 513-515. The Supreme Court described the facts in *Berry* as follows: "In that case, the victim wife had engaged in a two-week pattern of sexually arousing the defendant husband and taunting him into jealous rages over her love for another man, conduct we concluded would stir such a passion of jealousy, pain and sexual rage in an ordinary man of average disposition as to cause him to act rashly from this passion. [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 849 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) By contrast, in the present case, the uncontroverted evidence indicated Ms. Lujan sought to break off her relationship with her husband whom she had sued for dissolution of their marriage. Defendant's obsessive stalking conduct in this case and defiance to the repeated orders of two deputy sheriffs and a sergeant are in stark contrast to the facts in *Berry.* Ms. Lujan and Deputy Madrigal did nothing to provoke defendant so as to permit heat of passion instructions to be given.

Finally, separate and apart from the foregoing provocation analysis, the conduct in this case was not such as to cause an ordinary person of average disposition to act rashly and without due deliberation or reflection. (*People v. Barton, supra*, 12 Cal.4th at p. 201; *People v. Berry, supra*, 18 Cal.3d at p. 515.) Defendant separated from his wife in April 1998. He began stalking his estranged wife. On July 18, 1998, defendant was arrested for stalking after the incident which culminated in the parking lot of the Norwalk Sheriff's Station. On July 20, 1998, Sergeant Williams ordered defendant several times during a telephone conversation to stay away from Ms. Lujan. After the August 8, 1998, incident when Ms. Lujan and Ms. Romero arrived at the Velazquez residence, defendant was told once again by a deputy sheriff to stay away from Ms. Lujan and the Velazquez residence. On August 10, 1998, Sergeant Williams once again telephoned defendant. Defendant was ordered to stay away from Ms. Lujan. Defendant was advised that if he made any contact with Ms. Lujan, Sergeant Williams would personally arrest him. The foregoing does not constitute conduct by a reasonable person of average disposition; it is the actions of an obsessed stalker. The trial court correctly refused to give heat of passion instructions.

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is affirmed.

Grignon, J., and Willhite, J.,† concurred.

A petition for a rehearing was denied November 9, 2001, and on October 25, 2001, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 29, 2002.

---

*See footnote, *ante*, page 1389.
†Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.