Filed 1/22/16  P. v. Sanchez CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALEJANDRO SANCHEZ,<br><br>    Defendant and Appellant. | F067089<br><br>(Super. Ct. No. CRL007281)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

Lynne S. Coffin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Alejandro Sanchez, defendant, was found guilty at the conclusion of a jury trial of attempted murder of his stepfather (Pen. Code, §§ 187, subd. (a), 664). The jury found true allegations the attempted murder was willful, deliberate, and premeditated, defendant personally discharged a firearm causing great bodily injury, (*id*., § 12022.53, subd. (d)) and personally inflicted great bodily injury (*id*., § 12022.7, subd. (a)). In a bifurcated proceeding, the trial court found true allegations defendant had a prior serious felony offense within the meaning of the three strikes law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12) and a qualifying prior prison term enhancement (*id*., § 667.5, subd. (b)). The trial court sentenced defendant to a term of 51 years to life.

Defendant contends the trial court failed to instruct the jury on the lesser included offense of attempted voluntary manslaughter and an additional instruction on diminished capacity due to voluntary intoxication. Defendant also contends the trial court abused its discretion under Evidence Code[1] sections 352 and 1101 in permitting evidence of his prior conviction for assaulting his mother with a box cutter. We reject these contentions and affirm the judgment.

## FACTS

In August 2011, defendant began living in Los Banos with Cynthia Ramos, his mother, and Rito Ramos, his stepfather. Rito[2] had been defendant's stepfather since defendant was six years old. Rito let defendant use a 1997 Ford Ranger pickup truck, gave defendant his credit union debit card, and deposited $30 a week into the account for gasoline. After moving into his parents' home, defendant deposited about $1,600 in checks in the credit union account and withdrew the funds. The credit union contacted

---

[1]    All further statutory references are to the Evidence Code unless otherwise indicated.

[2]    To avoid confusion, we refer to members of the Ramos family by their first names. No disrespect is intended.

Rito because there was a problem with the checks defendant had deposited. Defendant assured Rito he had worked for the money and would straighten things out with the person who gave him the checks. Defendant said he would "pay back the bank."

Rito made arrangements with the credit union to pay $200 a month. Defendant was present. Rito told defendant he was going to have to pay the money. Defendant said he would get a job. Rito arranged to start the payments to the credit union in January 2012.[3]

Rito and Cynthia worked in the San Jose region, commuted with defendant, and usually left for work between 5:30 and 5:45 a.m. Defendant went to a trade school in Milpitas.

Prior to leaving the home the morning of February 1, defendant and Rito got into an argument. The registration on the Ford Ranger pickup truck was coming due, the truck had to pass a smog test, and it also needed a new clutch. The expenses were too much for Rito and he told defendant he was going to sell the truck to a junkyard. Rito asked defendant for the key to the truck. Defendant became angry. Cynthia told her husband and son to stop arguing. Rito and defendant argued about Rito's plans for the truck and about the money owed to the credit union. Defendant said he had no money.

Rito, Cynthia and defendant went outside. Rito told defendant he had to have the money owed "tonight … so [Rito] could pay the credit union or else." Defendant asked Rito if he was making a threat. Rito replied "Yeah, you better have the money." Rito closed the front door to the house. Rito turned around to face defendant, defendant pulled out a handgun and started firing it at Rito from a distance of eight to 10 feet. Rito was "pinned against the door." Rito heard seven shots. Five of the bullets hit him. Two bullets entered the front door in front of, and behind, Rito. Rito had bullet wounds to his

---

[3]     Hereafter, all dates refer to the year 2012.

"pinkie," another finger, his right side, and his back. Two bullets grazed Rito's head.[4] At one point, defendant moved forward and put the gun to Rito's head. Rito believed defendant "ran out of bullets."

Defendant ran to the driver's side of the family truck and told Cynthia, "Come on, mom. Let's go." Cynthia removed the keys from the truck. Cynthia saw defendant run toward the south. She called the 911 operator, reported the shooting, and said she thought defendant was in the backyard. Cynthia told an investigating officer that Rito told defendant prior to the shooting that "they could handle the situation today … [t]hat he could leave today."

Officers from the Los Banos Police Department responded to the 911 call. They found defendant walking on his parents' street. A .22 caliber Ruger was found in the street near the shooting and turned over to the police. The gun appeared to be scratched from the road or from a vehicle running over it. The ammunition magazine was empty, but there was one bullet in the chamber. The firing pin from the gun matched the firing pin indentation from four of the spent shell casings found at the scene of the shooting. The gun's serial number had been deliberately obliterated, something usually done to conceal the fact the weapon had been stolen. Two .22 caliber rounds were found in defendant's bedroom.

Defendant's sister, Jessica Ramos, testified that defendant and Rito had a few talks about defendant's debt, but they did not lead to arguments. A few days before the

---

**4**     Dr. Fereydoun Azadi, a trauma surgeon, operated on Rito's bullet wounds. Azadi described four bullet wounds: to the back of Rito's head, to the upper back of the chest, to the left side of the chest, and to the left hand of the fifth finger. According to Azadi, Rito would have died if his injuries had been left untreated. Two bullet fragments were left in his body.

Rito was hospitalized for two to three weeks. According to Rito, the doctors "cut [him] open" from his chest cavity to his belly button. He suffered a lot of pain post-surgery.

shooting there was a birthday party for defendant. Defendant was acting distant from the family and isolating himself. Defendant acted this way when he was using drugs. Jessica thought defendant may have used methamphetamine prior to the shooting. Jessica had no experience or training in recognizing when someone was under the influence of drugs, including methamphetamine. Jessica never saw defendant use methamphetamine. Jessica assumed defendant was using methamphetamine because he had been arrested for possessing it in the past. Between January 29 and February 1, defendant did not appear delusional to Jessica. He just stayed away from the family. Jessica let Rito into the house after he had been shot. Rito slumped to the floor with blood coming out of his head. Cynthia told Jessica that defendant shot Rito.

February 1 was a Wednesday. Cynthia told Detective Anthony Parker defendant had used methamphetamine the previous Thursday or Friday. She testified at trial, however, that she told investigators she thought defendant was under the influence of methamphetamine at the time of the shooting.

Parker was one of the investigators assigned to the shooting and had training on how people use methamphetamine. Parker had seen people under the influence of methamphetamine. On February 1, Parker observed defendant for two hours as defendant sat across a table from him after his arrest. Defendant did not appear to Parker to be under the influence of methamphetamine.

Detective Eduardo Solis observed defendant at the police annex after his arrest. Solis had narcotics training and experience with people under the influence of methamphetamine. People using methamphetamine often neglect eating and are paranoid. Defendant was nervous about his circumstances, but his demeanor was otherwise calm. Defendant was cooperative and answered questions. Defendant exhibited no symptoms of being under the influence of methamphetamine.

Officer Danny O'Day assisted with defendant's arrest and continued to observe defendant after he was brought to the detention facility to determine, among other things,

5

whether he was under the influence of narcotics or severely depressed. O'Day had experience with individuals under the influence of methamphetamine and described outward symptoms such as eyelid flutter, dilated pupils, muscle rigidity like a clenched jaw, sweating, and being fidgety. When cooperative, people under the influence of methamphetamine can interact "in a rapid fashion." They can also be "argumentative … [and] boisterous." O'Day observed defendant continuously in the detention facility for about four hours. O'Day saw no indication defendant was under the influence of methamphetamine.

Cynthia testified defendant cut her face with a box cutter but could not remember the exact date. Defendant was on methamphetamine. She woke him up. She then went to wash clothes. Defendant went into the kitchen and cut her. The wound required stitches and Cynthia sustained a scar from her mouth to her upper cheek bone.

## DISCUSSION

### I. ATTEMPTED VOLUNTARY MANSLAUGHTER

Defendant contends the trial court erred in failing to instruct the jury on the lesser included offense of attempted voluntary manslaughter. He believes there was sufficient evidence of provocation and heat of passion to negate the element of malice.

Even in the absence of a request from the defendant, the trial court in criminal cases must instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Najera* (2008) 43 Cal.4th 1132, 1136.) California law places a sua sponte duty on the trial court to instruct fully on all lesser necessarily included offenses that are supported by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149 (*Breverman*).)

Murder is the unlawful killing of a human being with malice aforethought. A defendant who commits an intentional and unlawful killing and who lacks malice is guilty of voluntary manslaughter. Generally, the intent to kill constitutes malice; malice is lacking, however, when a defendant acts in a sudden quarrel or heat of passion, or

6

when a defendant kills in unreasonable self-defense. (*Breverman*, *supra*, 19 Cal.4th at pp. 153-154.)

Because heat of passion and unreasonable self-defense reduce an intentional unlawful killing from murder to voluntary manslaughter by negating the malice element of homicide, voluntary manslaughter is considered a lesser necessarily included offense of intentional murder. (*Breverman*, *supra*, 19 Cal.App.4th at p. 154.) Neither heat of passion nor imperfect self-defense constitute an element of voluntary manslaughter that is affirmatively proven; instead, they are theories of partial exculpation. (*People v. Moye* (2009) 47 Cal.4th 537, 549; *People v. McCoy* (2001) 25 Cal.4th 1111, 1116.)

The provocation that incites the killer to act in heat of passion must be caused by the victim or reasonably believed by the accused to have been engaged in by the victim. The provocation must be enough to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708-709 (*Gutierrez*); see *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1411-1412.) Where there is no evidence in the record substantial enough for the jury to consider the lesser included offense of attempted voluntary manslaughter under a theory of sudden quarrel or heat of passion, the trial court has no duty to so instruct. (*Gutierrez*, *supra*, 112 Cal.App.4th at p. 709.) Substantial evidence is evidence sufficient to warrant consideration by the jury, it is not "'"'any evidence … no matter how weak."'"'" (*People v. Wilson* (2005) 36 Cal.4th 309, 331, italics omitted.)

The People cite to cases where the alleged provocation was insufficient to satisfy heat of passion. (*People v. Moye*, *supra*, 47 Cal.4th at pp. 551-554 [neither the victim's act of kicking the defendant's car, nor the victim's statement, "'Yeah, now I got you,'" coupled with his attack of the defendant with a bat were sufficient provocation to warrant an instruction on sudden quarrel/heat of passion voluntary manslaughter]; *People v. Gutierrez* (2009) 45 Cal.4th 789, 826-827 [a verbal argument with the victim followed by the victim engaging in simple assault on the defendant was insufficient provocation for

7

voluntary manslaughter, so instruction on it was not necessary]; *People v. Morse* (1969) 70 Cal.2d 711, 720, 734-735 [the victim-inmate not paying his debt to the defendant-inmate insufficient provocation to render an ordinary person of average disposition to act from passion rather than from judgment]; *People v. Dixon* (1995) 32 Cal.App.4th 1547, 1556 [the victim's refusal to engage in sexual relations with the defendant after being provided drugs was not the "kind of provocation recognized by California law to mitigate the crime of murder"; a reasonable person would not "develop homicidal rage" from such a refusal].) The People's point is well taken.

Defendant armed himself with a handgun. The argument between defendant and Rito was verbal and concerned money. Although Rito conceded he threatened defendant, the threat was to kick defendant out of the home for not paying his debt. No reasonable person would be provoked sufficiently by such a discussion to kill. There was no evidence defendant acted rashly or without due deliberation and reflection and from passion rather than judgment. The trial court did not err by not instructing on attempted voluntary manslaughter.

## II. INSTRUCTION ON VOLUNTARY INTOXICATION

The parties had an unrecorded discussion of jury instructions in chambers. Defense counsel requested CALCRIM No. 625, the instruction for voluntary intoxication.[5] The trial court found there was insufficient evidence defendant was under

---

[5] CALCRIM No. 625 provides: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant _____<*insert other specific intent required in a homicide charge or other charged offense*>.] [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

the influence of anything at the time of the shooting. The court did give an instruction requested by the prosecution that voluntary intoxication cannot negate the capacity to form mental states.[6]

Defendant contends the trial court erred in failing to instruct the jury on voluntary intoxication. Defendant asserts there was evidence he was sufficiently under the influence of methamphetamine to negate the specific intent to kill.

It is well settled that an instruction on the significance of voluntary intoxication is a pinpoint instruction. (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.) The trial court has no sua sponte duty to give the instruction unless asked to do so by the defendant. (*Ibid.*) Even where the defendant requests the instruction, the defendant is only entitled to it when "'there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."'" (*Ibid.*; see *People v. Williams* (1997) 16 Cal.4th 635, 677; *People v. Carpenter* (1997) 15 Cal.4th 312, 395 [having a dreamy look in the eyes, weird speech, being dazed and spaced out looking are not sufficient to establish diminished capacity by voluntary intoxication], superseded by statute on another ground as noted in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106-1107; *People v. Rodriguez* (1986) 42 Cal.3d 730, 762-763 [consumption of brandy, 151 proof rum, and cocaine plus being "'talkative and really hyper,'" but no evidence defendant's faculties were "affected sufficiently to

---

**6** As to voluntary intoxication, the jury was instructed: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. [¶] Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

The parties stipulated to the jury instructions not being reported and that the printed instructions were an accurate record of the instructions read to the jury.

interfere with his capacity to form the mental states requisite to murder," insufficient to support theory of diminished capacity due to intoxication]; see also *People v. Pensinger* (1991) 52 Cal.3d 1210, 1241-1242 [evidence of relatively mild alcohol consumption insufficient for instruction where there was no evidence the defendant appeared intoxicated].)

The testimony concerning defendant's use of methamphetamine came from his family members who explained that when he was using methamphetamine, defendant became reclusive and did not socialize with the family. Cynthia testified at trial she thought defendant was under the influence of methamphetamine when he shot Rito, but the day of the incident she told investigators defendant had used methamphetamine several days prior to the shooting. Cynthia, Rito, and Jessica all believed defendant had been using methamphetamine recently, but no one described him as having any symptoms of methamphetamine use at the time he shot Rito. Jessica described defendant as withdrawn, but did not see any sign he was delusional. No one in the family described conduct by defendant from which the jury could reasonably infer defendant was voluntarily intoxicated on the day of the shooting.

The police officers and detectives who transported defendant to the detention facility and observed him for hours after he was arrested, had narcotics training and experience with people under the influence of alcohol and drugs. None of them saw any objective sign defendant was under the influence of methamphetamine. There was no evidence to justify an instruction on voluntary intoxication.

## III.    OTHER-CRIMES EVIDENCE

The People sought to introduce evidence of defendant's conviction in 2007 for slashing his mother with a deadly weapon in 2006 (Pen. Code, § 245, subd. (a)(1)) pursuant to section 1101 to show motive, intent, knowledge, malice, and that the incident did not occur through random chance. The court ruled the evidence was admissible to show motive, intent, and absence of mistake. It was especially persuaded by the

10

"doctrine of chances,"**7** noting the odds were remote that "an innocent person" would "attack[] both of his parents with a deadly weapon." Analyzing the evidence under section 352, the court concluded its probative value was not substantially outweighed by undue prejudice of inflaming the jury or consuming undue time, and instructed the jury with CALCRIM No. 375.**8**

---

**7** The "doctrine of chances" has been used to analyze whether a death was caused by accident, suicide, or malice aforethought. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1378, 1380.) The doctrine addresses whether a defendant "'committed an actus reus when the defendant asserts that he did not cause the … harm ….'" (*Id.* at p. 1379; see *U.S. v. Woods* (4th Cir. 1973) 484 F.2d 127, 130, 133 [evidence the defendant had custody of, or access to, nine children who suffered from cyanosis or respiratory difficulty (seven of whom died) relevant to whether a 10th child with the same symptoms died accidentally, naturally, or at the hands of the defendant].) "'Once the possibility of accident is rendered unlikely, the most plausible explanation for the harm's occurrence is that the defendant caused it.'" (*People v. Spector*, *supra*, 194 Cal.App.4th at p. 1379.) The doctrine has also been applied to the issue of intent. "'[I]f a person acts similarly in similar situations, he probably harbors the same intent in each instance' …. The inference … is not that the actor is disposed to commit such acts; instead, the inference … is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution." (*People v. Robbins* (1988) 45 Cal.3d 867, 879, italics omitted; see *id*. at pp. 880-881 [prior uncharged murder of seven-year-old boy properly admitted to prove lewd intent and intent to kill].)

**8** Pursuant to CALCRIM No. 375, the jury was instructed: "The People presented evidence of other behavior by the defendant that was not charged in this case, namely that the defendant cut his mother's face with a box cutter. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged act. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged act you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant acted with the intent to kill his father; [¶] The defendant had a motive to commit the offense alleged in this case; [¶] The defendant knew that assaulting a family member was wrongful when he allegedly acted in this case; [¶] The defendant's alleged actions were not the result of mistake or accident; [¶] Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you

11

Defendant contends the trial court erred under sections 352 and 1101 when it admitted evidence of his assault on his mother, and also erred when it instructed the jury with CALCRIM No. 375. Assuming arguendo the trial court erred in admitting the other-crimes evidence, we find the error was harmless.

Error in the admission of prior-crimes evidence is reviewed pursuant to *People v. Watson* (1956) 46 Cal.2d 818, 836 to determine if it is reasonably probable that "a result more favorable to defendant would have resulted absent admission of this evidence." (*People v. Welch* (1999) 20 Cal.4th 701, 749-750.) Defendant's mother Cynthia and stepfather Rito both testified defendant shot Rito at point-blank range multiple times after the two had argued over money. Five bullets struck Rito, two shots missed him. Defendant moved forward and put the gun to Rito's head; Rito believed defendant "ran out of bullets." The gun used by defendant in the shooting was retrieved by the police. No witness observed objective symptoms immediately before or after the shooting that defendant was under the influence of methamphetamine or any other controlled substance. There is no doubt in this record that defendant had the intent to kill Rito as he shot at him. The evidence against defendant was uncontradicted and the prosecution witnesses testified consistently. There is little probability a result more favorable to defendant would have resulted from the omission of this evidence. If the more rigorous standard of review set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 applied to this case, we would reach the same conclusion.

conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of attempted murder. The People must still prove the charge and allegations beyond a reasonable doubt."

12

## **DISPOSITION**

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
POOCHIGIAN, Acting P.J.


_____
SMITH, J.

13