Filed 11/10/22  P. v. Vasquez-Collazos CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060525 |
| v. | (Super. Ct. No. 16WF2497) |
| OLGA VASQUEZ-COLLAZOS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles Ragland, Assistant Attorney General, Melissa Mandel and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

This case requires us to apply the United States Supreme Court's landmark decision in *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). It comes to us on appeal from a judgment sentencing appellant Olga Vasquez-Collazos to an indeterminate life term for conspiring to and murdering her husband. Appellant contends the trial court erred in admitting statements she made to the police during two pretrial interviews, one in 2014 and another in 2019. According to appellant, much of the first interview was inadmissible because the police did not advise her of her *Miranda* rights. And the contents of the second interview should have been excluded altogether because she was given a defective *Miranda* warning and did not knowingly waive her rights.

We find appellant was not in custody for *Miranda* purposes during the 2014 interview so that interview was properly admitted into evidence at her trial. Regarding the 2019 interview, we hold appellant's *Miranda* advisement was legally insufficient for failing to inform her she had the right to an attorney before questioning. However, because appellant did not raise this issue below, and she has not proven her attorney was ineffective for failing to do so, there is no basis for reversal. We thus affirm the judgment.

## FACTS

The seeds of this case were sown in Peru, which is where appellant met her alleged coconspirator and fellow Peruvian Roberto Saavedra around 2009. Although they dated for some time, appellant ended up marrying Adrian Zapata, who was more than 20 years her senior. Zapata was born in Peru and visited there often, but he lived and worked in Orange County, so his relationship with appellant was primarily long distance at first. However, in 2013, appellant left Peru with her two children and moved into Zapata's Westminster apartment with him.[1]

---

[1] Appellant's children were from relationships that preceded her meeting Zapata and Saavedra.

This brought appellant and Zapata closer together physically, but appellant still had feelings for Saavedra. In fact, by the time appellant moved to the United States, she and Saavedra had been having an affair for quite some time. To keep the affair going, Saavedra moved from Peru to Van Nuys not long after appellant moved to Westminster. After that, appellant used a secret phone to communicate with Saavedra, so Zapata had no reason to suspect he or his relationship was in any sort of danger. But on May 22, 2014, just two months after Saavedra arrived in America, Zapata was brutally murdered in his apartment.

Phone records show Saavedra traveled from Van Nuys to Orange County the night before the murder and communicated with appellant several times that evening. They also traded phone calls and texts the following morning, while appellant was at the apartment and Zapata was sleeping in his bed. At that time, Saavedra was in close proximity to the apartment. Although appellant left the apartment shortly before 8:00 a.m. to take her kids to school and run some errands, Saavedra remained in the area until about 8:15 a.m. At 8:45 a.m., he and appellant met up at the UCI Medical Center, and by 9:15 a.m., Saavedra was heading back to Van Nuys with the secret phone.

At roughly 10:00 a.m., appellant returned to the apartment and found Zapata dead in his bed. He had multiple stab wounds to the neck and had been bludgeoned in the back of the head with a heavy object. Appellant notified a neighbor, who called the police. When officers spoke with appellant at the scene, she appeared shocked and saddened by her husband's brutal demise. There were, however, two clues suggesting Zapata's death was not a random act of violence.

First, although the apartment had been ransacked, there were no signs of forced entry, and other than Zapata's phone, no valuables were missing. This led investigators to suspect the ransacking was staged. Second, officers found lingerie and condoms in Zapata's car outside the apartment. Appellant feigned ignorance of the items and suggested they signaled Zapata might have been having an affair. However, DNA

3

found on the lingerie was consistent with Saavedra's DNA, indicating the items had been planted in Zapata's car.

In her initial interviews with the police, appellant did not bring up her relationship with Saavedra. But in the following weeks, the police spotted them together on numerous occasions. Investigators also located phone and social media records that confirmed their ongoing affair. In addition, they discovered the deceased had several assets, including a condo in Peru, a 401(k) account, and a modest life insurance policy. All these things led to increased police scrutiny of appellant.

During an interview on November 20, 2014, roughly five months after the murder, the police told appellant they had found their suspect's DNA on Zapata's body. This was not true, as investigators did not find any incriminating evidence at the crime scene. However, the police informed appellant the DNA likely belonged to someone who was presently outside the country. At the time, Saavedra was in Peru. Even though the officers did not mention him by name, appellant was taken aback by this information. Instead of being happy at the prospect of the investigators solving her husband's murder, she became visibly agitated over their suggestion that Saavedra was the culprit.

Four days later, the police met with appellant in another attempt to gain information from her. This time, they told her flat out the suspect's DNA belonged to Saavedra. Appellant said she was surprised to learn this because Zapata and Saavedra were good friends who had talked about going into business together. She also downplayed her relationship with Saavedra, saying she only knew him through Zapata and had only seen him once since the murder. Asked if she could help the police find Saavedra, appellant said that would be hard because she had lost her phone.

The next day, November 25, 2014, the police interviewed appellant at the Westminster police department after she agreed to come in for further questioning. During the interview, appellant reiterated her lie about only seeing Saavedra once after Zapata's murder. When shown evidence to the contrary, she admitted having a romantic

4

relationship with Saavedra in Peru. But she insisted she ended it after marrying Zapata and she did not start seeing Saavedra again until after Zapata was murdered. Appellant also denied the existence of the secret phone she used to communicate with Saavedra, and she denied knowing anything about how Zapata had come to be a murder victim. She continued to claim Zapata and Saavedra had been on friendly terms with one another.

At the end of the interview, appellant was arrested and taken into custody. While she was in jail, she called her 16-year-old son Renzo and instructed him to remove a jewelry box from her car. She also told Renzo to tell the police that Zapata and Saavedra had been friends and that Saavedra had been over to their apartment to see Zapata before he was killed. Despite knowing about all this scheming, the police, unsure of their ability to convict appellant, decided to release her a week after her arrest without filing any charges against her.

Over the course of next four and a half years, appellant traveled to Peru on several occasions. During this time, the police continued their investigation, and when appellant returned from Peru on March 15, 2019, they arrested her and took her to the Westminster police station for questioning.

During the interview, appellant admitted seeing Saavedra while she was married to Zapata and using the secret phone to communicate with him at times. However, she said she could not remember if she had spoken with Saavedra the day before Zapata's murder, or if she saw Saavedra the day Zapata was killed. And while appellant admitted Saavedra had given her the lingerie that was found in Zapata's car, she denied knowing how it got there and continued to deny any involvement in his death.

Nonetheless, she was charged with first degree murder and conspiracy to commit murder. In addition, she faced a special circumstances allegation that she murdered Zapata for financial gain. Appellant did not testify at trial, but her attorney presented several character witnesses on her behalf and vilified Zapata to make it look like he could have had lots of enemies. Defense counsel also played up the fact there was

5

no direct evidence linking either appellant or Saavedra to Zapata's murder – precisely the argument that had delayed her arrest for so long.

In the end, the jury convicted appellant of the two charged offenses but rejected the financial gain allegation. The trial court sentenced appellant to 25 years to life in prison for her crimes.

## DISCUSSION

Relying on *Miranda*, appellant contends the trial court erred in admitting the statements she made to the police during her interviews on November 25, 2014 and March 15, 2019. As to the first interview, appellant complains she was never given her *Miranda* rights. And as to the second interview, she asserts her *Miranda* advisement was legally inadequate, as was her purported waiver. For the reasons explained below, we find the circumstances of appellant's first interview did not trigger the protections afforded by *Miranda*. And although appellant received a defective *Miranda* advisement prior to the second interview, we hold the admission of her statements from that interview is not cause for reversal.

### *November 25, 2014 Interview*

By the time appellant was interviewed by the police on November 25, 2014, she had been questioned by investigators on numerous occasions about her husband's murder, which occurred in May of that year. Although some of those interviews took place at the Westminster police station, none of them had resulted in appellant's arrest. So, when Detective Norma Vasquez-Phan called appellant on the 25th and asked her to come in for another interview, she obliged the request.

Upon arriving at the police station that day, appellant was escorted to one of the interview rooms in which she had previously been questioned. Besides her and Vasquez-Phan, the only other person in the room was Police Officer Jim Garcia, who conducted the interview in appellant's native Spanish. Appellant was never advised of her *Miranda* rights nor told she was free to leave, but neither was she handcuffed or told

6

she was under arrest.  Nor did the officers ever draw their guns or make any other overt display of authority or compulsion.

The interview began with Garcia making small talk with appellant about their mutual Peruvian heritage.  Then Garcia began asking appellant about her relationship with Saavedra.  Appellant admitted dating Saavedra before meeting Zapata, but she claimed there was nothing going on between them at the time Zapata was murdered.  Garcia told appellant he had been investigating the case for a long time and knew that was not true.  He also told appellant he knew Saavedra murdered Zapata, and it looked suspicious that she was lying about her relationship with Saavedra.  When appellant asked if he was accusing her of murdering her husband, Garcia reassured her he was not.  However, he also told her, "I know that you know what happened with your husband and that [Saavedra] had something to do with this."  In addition, Garcia cautioned appellant it would only make things worse for her if she wasn't honest with him.

Appellant insisted she was being truthful and had always fully cooperated with the investigation.  But when Garcia began to question her about the secret phone, she said "if you guys are accusing me of something, then I think I need to get a lawyer, right?"  After Garcia replied "okay," appellant started talking about how hard Zapata's death had been on her and how she had always tried to answer the officers' questions honestly.  That led to the following exchange:

Garcia:  "Okay, what is your decision?  Do you want to keep talking to us because we have more information –"

Appellant:  "Yes, let's see.  Yes, not a problem."

Garcia:  "That's fine.  Because you said something about a lawyer, but I want to show you things first."

Appellant:  "Yes."

Garcia:  "Is it okay if we keep talking?"

7

Appellant: "Yes, it's fine. Not a problem."

Garcia: "Do you need to go to the restroom or something like that, ma'am?"

Appellant: "No, no."

Garcia then proceeded to question appellant about a variety of topics, including her relationship with Saavedra, her actions on the day of the murder, and her communications with Saavedra around that time. Eventually, appellant admitted her relationship with Saavedra was more serious than she had previously let on. However, she insisted Saavedra and Zapata were good friends and Saavedra was saddened when she told him about Zapata's murder. She also continued to deny communicating with Saavedra near the time of the murder and insisted neither of them had anything to do with Zapata's death.

Garcia made it clear to appellant that he did not believe her and that he suspected Saavedra killed Zapata with her knowledge and assistance. In fact, Garcia said he already knew *how* the murder occurred, he just wanted to know *why* it happened. This made appellant very defensive. She resented Garcia accusing her of plotting to kill her husband and continued to deny any involvement in his death. When Garcia told her he had phone records showing she and Saavedra had been texting each other near her apartment around the time of Zapata's murder, appellant said, "I don't want to talk to you guys anymore. I'm going to look for an attorney." Garcia continued to question appellant for a while longer before she stated again she was going to hire a lawyer. At that point, appellant was arrested and taken into custody.

The trial court ruled appellant was not in custody during the bulk of the interview but rather voluntarily answered Garcia's questions in an attempt to convince him she had nothing to do with Zapata's murder. However, once she said she did not want to talk anymore and was going to look for an attorney, the police were required to terminate the interview. Therefore, anything appellant said after that was inadmissible.

8

Appellant contends that was not good enough. While conceding she was not in custody at the outset of the interview, she maintains that changed when she first mentioned she might need a lawyer. This is the point of the interview quoted above at which Garcia sought clarification and asked appellant if she wanted to keep talking. When appellant answered, "Yes, not a problem," Garcia asked her if she needed to use the restroom, and appellant said no. Appellant argues additional questioning beyond that juncture was prohibited by *Miranda*.

The *Miranda* decision was designed to protect persons suspected of criminal activity from the inherently coercive circumstances attendant police interrogations. (*Miranda, supra*, 384 U.S. at p. 444.) By requiring the police to inform a suspect of his right to remain silent and consult with an attorney, the high court sought to implement the constitutional privilege against self-incrimination and ensure "the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." (*Id*. at p. 469.)

However, "police officers are not required to administer *Miranda* warnings to everyone whom they question." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" (*Ibid*.) In deciding the custody issue, we do not consider the "'subjective views harbored by either the interrogating officers or the person being questioned.' [Citation.]" (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 663.) Rather, we must assess the objective circumstances surrounding the interrogation to determine whether a reasonable person in the suspect's position would have felt at liberty to terminate the questioning. (*Thompson v. Keohane* (1995) 516 U.S. 99, 112–113.) This depends on whether the suspect was formally arrested, or his freedom of movement was restrained to the degree associated with a formal arrest. (*Id*. at p. 112; *Stansbury v. California* (1994) 511 U.S. 318, 322; *People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

No single factor is dispositive.  (*Howes v. Fields* (2012) 565 U.S. 499, 509.)  However, courts have developed several factors bearing on the custody issue, including the length of the interrogation, where it occurred and the ratio of officers to suspects.  (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1753.)  "Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview.  [Citation.]"  (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403–1404.)

In this case, appellant voluntarily went to the Westminster police station for questioning and was interviewed in a room that was familiar to her by virtue of her prior interviews, after each of which she had left and gone home.  While the two officers who questioned her did not tell her she was free to leave, neither did they tell her she was under arrest or restrain her in any fashion.  There was nothing about the interview to distinguish it from the two previous interviews which no one contends were custodial.  Nor did they interview her for a particularly long period of time, judging by the fact the entire interview – including both the Spanish transcription and the English translation – is set forth in a single volume of the clerk's transcript.

Appellant correctly notes that after a cordial start, the interview turned accusatory, and Garcia repeatedly confronted her with both real evidence (the phone records) and false information (the DNA ruse) in order to get her to confess.  However, appellant showed no signs of intimidation.  She held her own during the interview and pushed back hard against Garcia's accusations.  When she did, Garcia backed down in a respectful manner.  While he was certainly direct with appellant at times, he was not

10

oppressive or overbearing. And at one point, he even offered to let her use the restroom, signaling her freedom to leave the room.

The United States Supreme Court has determined that targeted questioning of a person suspected of criminal misconduct does not necessarily trigger *Miranda*. (*Oregon v. Mathiason, supra,* 429 U.S. at pp. 495-496.) "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue[.]" (*Stansbury v. California, supra*, 511 U.S. at p. 325; accord, *People v. Moore* (2011) 51 Cal.4th 386, 402; *People v. Stansbury* (1995) 9 Cal.4th 824.) Therefore, the accusatory nature of the questioning is not determinative, even though appellant was eventually arrested at the end of the interview.

Appellant also finds it significant that she mentioned an attorney early on during the interview when she told Garcia, "[I]f you guys are accusing me of something, then I think I need to get a lawyer, right?" She insists that even if that request for counsel was equivocal – which it certainly was – it was sufficient to require the officers to stop questioning and advise her of her *Miranda* rights. However, that argument puts the cart before the horse. Because the dictates of *Miranda* are not triggered until the suspect is in custody, the police are not required to cease questioning or administer *Miranda* warnings during a noncustodial interview, even if the suspect attempts to assert his *Miranda* rights. (See *Montejo v. Louisiana* (2009) 556 U.S. 778, 795 ["If the defendant is not in custody then [*Miranda*] do[es] not apply."]; *Bobby v. Dixon* (2011) 565 U.S. 23, 28 [a suspect cannot "invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'"], quoting *McNeil v. Wisconsin* (1991) 501 U.S. 171, 182, fn. 3.)

Thus, the critical issue is not whether appellant's attempted invocation was sufficient to trigger the *Miranda* safeguards, as the trial court appeared to believe, but whether the circumstances, including the attempted invocation, were such as to render appellant in custody in the first place. (See *State v. Wright* (Mo.Ct.App. 2019) 585 S.W.3d 360, 372 [a suspect's request for counsel is but a single factor in the custody

11

equation and is insufficient by itself to transform a noncustodial setting into a custodial one].) Viewing the totality of the circumstances surrounding the interview, we do not believe appellant was in custody until she was formally arrested. Therefore, the trial court did not violate *Miranda* by admitting statements appellant made before that point.

*March 15, 2019 Interview*

This interview was conducted by Detective Jim Wilson and Police Officer Sam Gradilla at the Westminster police department following appellant's arrest at the Los Angeles International Airport. According to Gradilla, he gave appellant her *Miranda* rights at the start of the interview using the standard advisement form issued by the Westminster police department. In particular, he told appellant in Spanish: You have the right to remain silent. Anything you say can be used against you in court. You have the right to speak to an attorney during your interrogation. If you cannot afford an attorney, one will be assigned to you if that's what you decide.

Gradilla then told appellant to sign the advisement form if she understood her rights. After she signed the form, the interview began, and appellant made several false statements regarding her relationship with Saavedra and her communications with him around the time of Zapata's murder. The interview ended when appellant invoked her right to an attorney, at which point she was transported to jail.

At the hearing on the admissibility of appellant's statements, she testified Gradilla did not *Mirandize* her until the end of the interview. However, the court accepted Gradilla's testimony to the contrary and ruled appellant's statements were admissible. In so ruling, the court rejected appellant's claim that she did not knowingly and voluntarily waive her *Miranda* rights. Although there was no evidence of an express waiver, the court found appellant was eager to talk to the officers and voluntarily relinquished her right to remain silent.

Appellant challenges the trial court's ruling on two grounds. First, she raises a claim that she did not bring up in the trial court, i.e., Gradilla's admonishment

12

was defective under *Miranda* because he did not advise her that she had the right to a speak to an attorney *before* questioning started. Second, appellant renews her claim that she did not knowingly and voluntarily waive her *Miranda* rights.

As to the first issue, respondent contends appellant forfeited her right to challenge the facial validity of her *Miranda* advisement because she did not raise that issue below. We agree. A party must make a timely and specific objection to the erroneous admission of evidence in order to preserve the error for appeal. (Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 434-435.) This rule applies even to errors of constitutional magnitude, like those involving the application of *Miranda*. (See, e.g., *People v. Linton* (2013) 56 Cal.4th 1146, 1166; *People v. Crittenden* (1994) 9 Cal.4th 83, 126; *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194-1195.) Because appellant did not challenge her interview statements below on the basis her *Miranda* advisement was defective, she has forfeited her right to do so now. (*Ibid.*)

However, that does not entirely foreclose our consideration of the issue because appellant contends her attorney was ineffective to the extent he failed to preserve it for appellate review. In order to forestall a petition for writ of habeas corpus based on a claim of ineffectual counsel, we will consider appellant's facial challenge to her *Miranda* advisement under the framework developed in *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*). Under that framework, appellant must not only prove that her attorney was deficient for failing to challenge the sufficiency of her *Miranda* advisement, but also that there is a reasonable probability she would have obtained a more favorable outcome at trial had he mounted such a challenge. (*Id*. at p. 694; accord, *People v. Linton, supra*, 56 Cal.4th at pp. 1166-1168 [applying *Strickland* framework to *Miranda* claim that was forfeited for lack of objection in the trial court]; *People v. Mayfield* (1993) 5 Cal.4th 142, 176 [same]; *People v. Torres* (2018) 25 Cal.App.5th 162, 171-180 [same].)

Whether appellant's attorney was deficient for failing to challenge the sufficiency of her *Miranda* advisement turns on whether such an objection would have

13

been meritorious. (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 375; *People v. Linton, supra*, 56 Cal.4th at pp. 1166-1168.) As we have explained, the *Miranda* decision was designed to protect the Fifth Amendment privilege against self-incrimination, which is applicable to the states through the Fourteenth Amendment. (See generally *Vega v. Tekoh* (2022) 597 U.S. __ [142 S.Ct. 2095].) To guard against the inherently coercive nature of such encounters, the Supreme Court ruled a suspect who is being interrogated while in police custody must be told "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra*, 384 U.S. at p. 479.)

Regarding the right to the presence of counsel, the Supreme Court has subsequently clarified that the suspect must be informed he has the right to an attorney both during *and* before questioning. (*Duckworth v. Eagan* (1989) 492 U.S. 195, 204; *California v. Prysock* (1981) 453 U.S. 355, 360; accord, *People v. Kelly* (1990) 51 Cal.3d 931, 948-949; *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1399.) "The right to consult with an attorney *before* questioning is significant because counsel can advise the client whether to exercise his right to remain completely silent, or, if he chooses to speak, which questions to answer or how to answer them. Thus, it is extremely important that a defendant be adequately warned of this right. [Citation.]" (*People of the Territory of Guam v. Snaer* (9th Cir. 1985) 758 F.2d 1341, 1343 (*Snaer*).) While no "talismanic incantation" is required to satisfy this requirement (*California v. Prysock, supra*, 453 U.S. at p. 359), the officer's advisement must reasonably convey to the suspect that he not only has the right to counsel during questioning, but that he has the right to consult with an attorney before questioning begins. (*Ibid.*; *Snaer, supra,* 758 F.2d at p. 1343.)

In arguing the *Miranda* warnings appellant received fulfilled this requirement, respondent draws our attention to cases where the subject advisement was upheld even though it did not use the words "before" or "prior to" in explaining the right

to counsel. For example, in *Snaer*, the defendant was advised, "You have a right to consult with a lawyer and to have a lawyer present with you while you are being questioned." (*Snaer, supra*, 758 F.2d at p. 1342.) Looking at that phrase as a whole, the court concluded "the first part of that sentence read in the context of the latter half of the sentence does adequately convey notice of the right to consult with an attorney before questioning." (*Id*. at p. 1343, fn. omitted.) In other words, the court was satisfied that if the police tell a suspect he has the right to consult with an attorney before telling him he has the right to have an attorney present during questioning, the reasonable inference is that the right to counsel attaches both before and during questioning.

As respondent points out, other courts have employed similar reasoning where the defendant was told both that he had the right to consult or speak with an attorney and that he had the right to have an attorney present during questioning. (E.g., *United States v. Gutierrez-Diaz* (9th Cir. 2020) 792 Fed.Appx. 512, 513; *State v. Nave* (Neb. 2012) 821 N.W.2d 723, 737; *State v. Brown* (Wash. 1997) 940 P.2d 546, 573-575.) However, appellant's admonishment did not contain both of these components. She was told she had the right to speak to an attorney during her interrogation, but she was not told she had the right to consult with an attorney generally. Therefore, she had no reason to believe her right to an attorney extended to the period of time before the interrogation began.

*State v. Serna* (N.Mex.Ct.App. 2018) 429 P.3d 1283 (*Serna*), involved a similar situation. In that case, the suspect was told, "You have the right to an attorney during any and all questionings." (*Id*. at p. 1285.) Finding that statement insufficient to inform the suspect of his right to an attorney *before* questioning, the court reasoned, "The use of the word 'during' is pivotal. 'During' is a preposition and is defined as 'throughout the duration of.' [Citation.] A 'preposition' is 'a function word that typically combines with a noun phrase to form a phrase which usually expresses a modification or predication.' [Citation]. Thus, 'during' modifies the phrase 'you have a

15

right to an attorney' and restricts that right to the duration of any questioning by law enforcement. Even viewing this language in a manner extending the utmost latitude to the law enforcement officer – and bringing common sense to bear – we still cannot see how 'during' could be understood to apply backwards to also mean prior or before." (*Id*. at p. 1290.)

Neither can we. We also fail to see how informing appellant she had the right to an attorney "during" her interrogation, would have adequately apprised her that her right to counsel extended to the period before questioning commenced. It's true that appellant was also told an attorney would be appointed for her if she could not afford one. And if that aspect of the advisement had been worded differently so as to enlighten appellant to the fact her right to appointed counsel attached *before* questioning, we would have little sympathy for her argument. (See *People v. Kelly, supra,* 51 Cal.3d at pp. 948-949 [read as a whole, the defendant's advisement was sufficient because it not only told him he had the right to counsel while being questioned but he would be provided an attorney *before questioning* if he could not afford one].) However, appellant was not told that. After being informed she had the right to an attorney during questioning, she was simply told an attorney would be appointed for her if she lacked the means to hire one. The logical inference from these back-to-back statements is that appellant's right to an appointed attorney only extended to the time she was being questioned. (See *Serna, supra*, 429 P.3d at pp. 1289-1291; *Snaer, supra*, 758 F.2d at p. 1342, fn. 2.)

Respondent asserts it doesn't really matter if appellant believed her right to counsel did not kick in until formal questioning began because if that was the case all she had to do was wait until the first question was posed and then ask for an attorney. That's a lot to ask of a person who is being questioned about her husband's murder, especially someone raised in a different culture. We do not believe most people would parse the interrogation process in such a nuanced manner. Nor should they be required to. The right to consult with an attorney is too important to make its implementation dependent

16

on a suspect's ability to draw fine distinctions about when that right attaches or how it can be invoked.

Because the right to speak with an attorney before police questioning is an integral safeguard against self-incrimination, and because appellant was not reasonably apprised of that right at the start of her 2019 interview, her *Miranda* advisement was defective, as was her purported waiver of rights. (*Serna, supra*, 429 P.3d at p. 1291.) Therefore, defense counsel was remiss for failing to move to suppress her interview statements on that basis.

Nevertheless, there are several reasons why the erroneous admission of appellant's statements was not prejudicial under the *Strickland* framework. First of all, appellant never confessed. While the erroneous admission of a criminal confession is uniquely harmful to a defendant's prospects for success at trial, appellant never admitted any personal criminal wrongdoing. Nor did she incriminate Saavedra, for that matter. The most damaging aspect of her interview was her propensity to perpetuate the lies she had told during her previous interviews – which brings us to our second point.

By the time the 2019 interview occurred, appellant had already shown herself to be intentionally deceptive in her early interviews with the police. Among other things, she had lied about her relationship with Saavedra, the secret phone they used to communicate, and what they did and talked about on the day of the murder. Although appellant lied about those topics again during her 2019 interview, those falsehoods were largely cumulative of her previous prevarications. So, even without that interview, the prosecution would have had plenty of ammunition for impugning her credibility and arguing her deceptive tactics were proof of a guilty mind.

But it's not the lying that hurt appellant the most. Rather, it's the fact the police had actual evidence of the things she lied about, i.e., her relationship and contacts with Saavedra. That evidence was proven through the phone records, which the prosecutor described in her closing argument as "the most compelling and damning"

17

evidence in the entire case. In addition to laying bare their passionate love affair, those records also established appellant and Saavedra were communicating with each other near Zapata's apartment at the time he was murdered.

Of course, the police also knew from their own investigation that the murder scene had been staged to make it look like Zapata had been killed during a burglary, and the lingerie with Saavedra's DNA had been planted in Zapata's car. So, even without appellant's statements from her 2019 interview, the prosecution's case against appellant – while circumstantial – was a hydra. The loss of one of its heads would have been nugatory.

Given all these circumstances, we do not believe there is not a reasonable probability – defined as a probability "sufficient to undermine confidence in the outcome" (*Strickland, supra*, 466 U.S. at p. 694) – appellant would have obtained a more favorable verdict had her 2019 interview statements been excluded from the trial. Therefore, their admission is not cause for reversal.

### DISPOSITION

The judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18